IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| AL EVERITT BOYETT, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:05-CV-966-D |
| | ) | |
| ANTHONY CLARK, SHERIFF, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF MILLARD McWHORTER, M.D.

Before me, the undersigned notary public, in and for said County and State, personally appeared **Millard McWhorter, M.D.**, who, after first being duly sworn by me, deposes and states as follows:

1.    My name is Millard McWhorter, M.D. I am over the age of 19 years and have personal knowledge of the facts contained herein.

2.    I obtained my medical degree from Meharry Medical College in Nashville, Tennessee in 1981. From 1981 to 1984, I performed a residency at Morehouse Family Practice Program at Southwest Community Hospital in Atlanta, Georgia. From January 1985 to May 1986, I was in private practice in Monticello, Georgia. From June 1986 to September 1992, I was the medical director at Red Level Medical Clinic in Red Level, Alabama. During this same timeframe, I was also a consultant to the Community Mental Health First Step Clinic for Alcohol and Drug Abuse in Red Level, Alabama. From September 1987 to April 1989, I was the chief of staff and medical director at Columbia Regional Medical Center in Andalusia, Alabama. From January 1989 to December 1992, I was a physician for Spectrum Emergency Services, where I worked in emergency

rooms in Georgia and Alabama. From October 1992 to December 1993, I was a staff physician for the Davis Medical Group in Huntsville, Alabama. From January 1994 to July 1999, I was the medical director for the Central State Prison in Macon, Georgia. From October 1999 to July 2001, I was the medical director for Fountain/Holman Correctional Facilities in Atmore, Alabama. From February 2002 to the present, I have been employed by Southern Health Partners as the medical director of the Covington County Jail in Andalusia, Alabama, and I have also been in private practice in Andalusia, Alabama.

3.      I am licensed to practice medicine in the State of Alabama and have been so since 1986. I am also licensed to practice medicine in the states of Georgia and  Tennessee.

4.      Southern Health Partners, Inc. (hereinafter SHP) provides medical care to inmates in various jail facilities, including the Covington County Jail. During the entire time of plaintiff's incarceration in the Covington County Jail, health care services have been provided to the inmates by SHP pursuant to a contract between SHP and the Covington County Commission. Health care in the jail is provided under the direction of a medical team administrator as well as a medical director. During the period complained of by the plaintiff in this action, I was the medical director in the jail and Jamie Mitchell was the medical team administrator.

5.      When an inmate in the jail requires routine medical care, he or she obtains an inmate sick call slip from the corrections officer on duty in the housing unit and that form is provided to the medical staff for action. Routine sick calls are conducted by the medical staff inside the housing unit.

6.      As I understand the plaintiff's complaint and amended complaint in this case, the plaintiff alleges that SHP, Jamie Mitchell and myself denied the plaintiff proper medical care by failing to acknowledge and treat the plaintiff's hepatitis C.

7.      I have reviewed SHP's entire medical chart concerning the plaintiff.

8.      On June 7, 2005, the plaintiff was booked into the Covington County Jail. On plaintiff's medical screening form, jail personnel noted that plaintiff had hepatitis but described plaintiff as "fine at time of intake."

9.      On June 8, 2005, nurse Connie Lyons interviewed the plaintiff for a medical staff screening form, noting that plaintiff had a history of drug use and had been exposed to hepatitis C.

10.     On June 13, 2005, the plaintiff completed an inmate sick call slip, where he complained of an ear infection. He was treated the next day by nurse Donna Cooey. Pursuant to my standing order for treatment of ear infections, he received an ear wax removal kit with orders to use five to ten drops twice a day for four days. He was instructed to return to medical staff if the pain continued.

11.     On June 17, 2005, I saw the plaintiff in followup to his complaints of pain in his ear, and started the plaintiff on Amoxicillin 500 mg., two tablets by mouth twice a day for seven days, and ordered that he continue with his ear wax removal kit.

12.     Later that day, the plaintiff completed an inmate sick call slip, complaining that his ears were in pain. On the following day--June 18, 2005--he was seen by nurse Connie Lyons, and I ordered that he receive 800 mg. of ibuprofen, one table twice a day for seven days.

13.     On June 19, 2005, Connie Lyons interviewed the plaintiff for a history and physical form, wherein she scheduled plaintiff to see me on June 22, 2005.

14.     On June 22, 2005, I saw the plaintiff for complaints of abdominal pain and impacted ear wax. I ordered Zantac 150 mg., one tablet twice a day for 30 days, and Colace, to be applied to both ears every day.

15.     On June 24, 2005, the plaintiff complained of pain with his ears again, and he was referred to me.

16.     On June 29, 2005, the plaintiff completed an inmate request/grievance form where he requested that I refer him to another doctor regarding his ear pain. Later that day, I saw the plaintiff, and he presented to me with complaints of ear congestion and leg cramps. With regard to the plaintiff's ears, I observed that there was fluid behind the tympanic membrane. My assessment was chronic sinusitis and leg cramps. I ordered the plaintiff to receive 750 mg. of Robaxin, one tablet twice a day for ten days, and Deconamine SR, one capsule twice a day for thirty days, with refill x 2.

17.     After June 29, 2005, plaintiff never complained of any further pain or problems with his ears.

18.     On August 16, 2005, an X-ray was performed on the plaintiff's left hand by Dr. Vincent Martin at Southern Radiology Services, LLC, noting that the plaintiff had a "nondisplaced fracture of the distal fifth metacarpal."

19.     On August 17, 2005, I saw the plaintiff for a follow-up of his left hand injury. I informed the plaintiff that I saw no fracture in the X-Ray, and that I would send the X-Ray back to the radiologist to read. During this presentation, the plaintiff complained of having hepatitis C.

20.     On August 25, 2005, nurse Patsy Colvin interviewed the plaintiff for a history and physical. In the plaintiff's medical history, the plaintiff stated that his family physician was Dr. V.J. Viyas and that he was on no current medication for any medical condition. The plaintiff reported a history of psychiatric problems and illegal drug use.

21.     On September 3, 2005, the plaintiff complained of problems related to "sores" on his posterior. He was seen later that day by nurse Camelia Williams, who carried out my standing order

with regard to treatment of sores and boils: Doxcycline, one tablet or capsule, 100 mg. by mouth twice a day for ten days; ibuprofen, 800 mg., one tablet by mouth twice per day for ten days; and Hibiclens, which is a solution that the plaintiff would be required to shower with three times that week.

22.    On September 7, 2005, I saw the plaintiff regarding his hepatitis C condition. I told the plaintiff that I did not think he needed treatment for this condition, but that he could see his own doctor at his own expense. The plaintiff never made arrangements to see his own physician.

23.    On October 7, 2005, the plaintiff again complained of a boil or bite, this time on his inner thigh. On the same day, he was seen by nurse Donna Cooey, who noted that there were sores on his groin area and that he had a very large sore on his left side with edema and redness, and that the plaintiff was complaining of severe pain. I ordered that the plaintiff receive Bactrim DS, one tablet by mouth once a day for ten days, Doxcycline, one tablet or capsule, 100 mg. by mouth twice a day for ten days, and Percogesic, two tablets by mouth twice a day for ten days. The plaintiff was to follow up with me on my next visit to the jail, which would have been Wednesday, October 12, 2005.

24.    However, on October 12, 2005, Boyett refused to be seen by me.

25.    On October 21, 2005, the plaintiff executed a request/grievance form where he requested that I schedule a "RNA test for HCV," which is a test to confirm hepatitis C. On October 24, 2005, I ordered that the plaintiff receive this test, which confirmed that the plaintiff was positive for hepatitis C.

26.    On November 1, 2005, the plaintiff complained that sores were "coming back," and that he had a brown spot on his leg that had been spreading and reached the other leg. On the same day, Jamie Mitchell treated the plaintiff, noting that he had sores on his leg and buttocks. The

plaintiff was then administered Doxcycline, one tablet or capsule, 100 mg. by mouth twice a day for ten days, Bactrim DS, one tablet by mouth twice a day for ten days, ibuprofen, 800 mg. twice a day for ten days, and Tums, 2 tablets twice a day as needed. On November 7, 2005, I ordered that the plaintiff apply miconazole cream to his genital area twice a day to treat this condition.

27.     I never told the plaintiff that it would be too expensive or costly to treat his hepatitis C. My decision not to treat the plaintiff's hepatitis C had nothing to do with the cost or expense of such treatment. On the contrary, based upon my medical background, training and experience, I found that the plaintiff, although hepatitis C positive, was asymptomatic and not in need of treatment. It is my opinion that my decision not to treat the plaintiff's asymptomatic hepatitis C was within the standard of care for a physician encountering a similar patient under the same or similar circumstances, and that it certainly was not indifferent to the plaintiff's medical needs, nor did it place the plaintiff at risk of any serious harm.

28.     All of the information contained herein is based upon my personal knowledge and the plaintiff's medical chart.

29.     All necessary care provided to the plaintiff by SHP, Jamie Mitchell and myself was appropriate, timely and within the standard of care.

30.     On no occasion was the plaintiff ever at risk of serious harm, nor was the medical staff ever indifferent to any complaint that he made.

_____

Millard McWhorter, M.D.

_MD_

STATE OF ALABAMA                    )
                                    )
COUNTY OF _Madison_                 )

    I, the undersigned Notary Public in and for said county in said state, hereby certify that Millard McWhorter, whose name is signed to the foregoing and who is known to me, acknowledged before me that, being fully informed of the contents of said instrument, she executed the same voluntarily on the day the same bears date.

    GIVEN UNDER MY HAND and official seal on this the _2_ day of _March_ , 2006.

_____
Notary Public
My Commission Expires: _12-3-2007_